STATE OF IOWA, Appellee, v. MELVIN FURLONG et al., Appellants.

No. 41442.

JUNE 20, 1933.

Geo. W. Sprenger, for appellants.

Edward L. O'Connor and Walter F. Maley, for appellee.

EVANS, J.—The defendants were arrested in Wapello county on September 12, 1931. They were strangers, who had come into the city of Ottumwa and were engaged upon the golf grounds in a game of golf at the time of their arrest. They had stopped in Ottumwa briefly the day before, and had gone from there to Boone and from Boone .to Des Moines, and from Des Moines to Ottumwa again. They rode together in a large Packard car of one hundred horse power. While they were engaged in their game at the golf grounds, the sheriff and his deputies searched their car and found therein the following contents:

"Winchester rifle, wrecking bar, sledge and handle, steel hacksaw, battery and box, two large gun clips, and one small clip, two screw drivers, one punch, two bars of soap, adhesive tape, steel drill, three revolvers, two boxes of shells, two gloves, bottle containing nitroglycerin, two Ohio license plates, two small files, license certificate from Indiana, certificate of title to motor vehicle and sale slip for sledge." (The firearms were all fully loaded.)

Furlong, as a witness, assumed the ownership of the car and its contents, and absolved the other two men from all responsibility. He testified also, in the same connection, to his own innocence of any wrongful intent. The evidence introduced by the state was quite abundant to sustain a verdict of guilty. The principal controversy developed in the evidence was whether the instruments found in the Packard car were burglar tools. The state used expert evidence upon that question. The substance of the evidence for the state was that each item of the property thus discovered was suitable for use for burglary purposes. Concededly they could each and all be used likewise for legitimate purposes. Because of

an alleged error in the admission of one item of testimony, we set forth herein the state's redirect examination of its expert witness, Pettit:

"Q. Well, was there any—I will put it this way, then, from your experience over the last seventeen years state whether or not the tools there—and implements which are on this table are— could be used as a complete set of burglar tools? A. They could be.

"Q. And I believe you testified that any one of them might be considered a burglar tool? A. It could be used for that purpose.

"Q. It could be used for that purpose? A. Yes, sir.

"Q. Mr. Pettit, Mr. Duke asked you about—did you ever see a tool that was made—that had stamped on it burglar tools? A. No, sir.

"Q. Do you know of any manufacturer that makes a specialty of making burglar tools? A. No, sir.

"Q. And isn't it a fact—or what is the fact, Mr. Pettit, as to whether or not the tools that you ordinarily find or have found in your experience at places where there had been burglaries, as to whether or not those tools could be used also for legitimate purposes? A. They could.

"Q. And so burglar tools, in your experience and observation, have you observed whether burglar tools are such tools that they could be used, for instance, for other purposes also? A. They are.

"Q. And take, for instance, this sledge here; take a sledge of this kind. Could you drive a fence post with that? A. Yes, sir.

"Q. Take this—if a carpenter—if you found that in the possession of a carpenter who was a good, reputable citizen, and who was in the carpenter business, that might not necessarily be considered a burglar tool, would it? A. No, sir.

"Q. Or if you found this sledge hammer in the possession of a man who was a farmer or a mechanic or garageman or something like that, that might not necessarily be a burglar tool at all, would it? A. No, sir.

"Q. Or take, for instance, this steel saw here, if you found that in a garage, in with the regular garage set of tools, that might not be a burglar tool in itself at all? A. No, sir.

Q. But taking those—supposing now that these guns and

these other equipment—supposing that these guns were found in the same car with these other tools and hacksaw and bar and Winchester rifle and radio 'B' battery and soap and tape, supposing that there was found in that car a half pint bottle of nitroglycerin, what would you say as to whether or not these guns, from your experience and observation, *would* be used for burglary purposes?

"Mr. Duke, I object to that as an ultimate conclusion that the jury has got to reach, not for him to say.

"The Court: He is testifying here as an expert. He may answer. (All of which was duly excepted to at the time.) A. Yes, sir, they would be."

The appellants assign error upon the use of the word "would" above italicized in the last question propounded by the state. It must be conceded, we think, that the court erred in permitting the question to be answered in that form. It was permissible to the state to prove what each instrument *could* be used for and that it *could* be used for purposes of burglary. It was proper also to prove that such an instrument was frequently used in cases of burglary. With the exception of the use of the word "would" in the single instance, the examination of the expert witnesses was held to the question as to what these instruments *could* be used for. The question confronting us is whether the error in the ruling of the court was sufficiently substantial as to be prejudicial. For the purpose of getting light upon the intended meaning of the objectionable question, we have set forth above its preceding context. From the examination as a whole at this point, it is obvious that the intent of the question and answer was to show that the instruments under consideration by the witness were of the kind that "would be used for burglary purposes." The defendants concede in effect that the jury was properly instructed as to the law, and no complaint is made of the instructions; nor are they set forth. Correct instruction would of itself put the objectionable question and answer in their true light. It is quite inconceivable that the error, such as it was, could mislead the jury or operate prejudicially. Therefore, though we recognize the error in a formal sense, we are compelled to say that it could not have been prejudicial.

II. No other specific ground of reversal than that above indicated is presented by the appellants. It is earnestly urged, however, there was no sufficient proof beyond a reasonable doubt that

these particular defendants were in possession of the alleged tools; and none that these particular defendants had any intent to use such tools to commit a burglary.

Proof of the possession by each of the defendants was quite abundant in a legal sense. The three indicted men were without dispute in apparent joint possession of the automobile and of its contents. Granted that the "apparent" was subject to explanation and contradiction, the defendants had their opportunity in that respect. The credence to be given to explanation or to denial was a question for the jury.

As to intent, it was not required that it be proved by direct evidence. Intent is seldom so proved. The jury could start with the inference that the possession of the tools had some purpose, either lawful or unlawful. Whether the purpose was a sinister one would naturally be reflected by the circumstances surrounding such possession. The defendants purported to make an explanation as to most of the instruments. It was not persuasive. They were strangers in Ottumwa. They had no apparent business there. They claimed a residence in Indiana. They all carried "aliases". Each of them adopted different names in different places. The only occupation claimed by Kelso was that of a professional golfer; and by Brown that of a gambler. Their codefendant and witness, Furlong, had served a term in prison for robbery. The jury could have found under the testimony, including that of the defendants, that they had no use for, and no purpose to use, any of the instruments found in their possession, except a sinister one. The fact that virtually every instrument found could be rendered useful in a burglary was an initial circumstance on the question of intent. The fact that most of these instruments, if not all of them, had no particular connection with the operation or care of an automobile; and, furthermore, the fact that the transportation of these instruments in an automobile served only to separate them from contact with the legitimate uses for which they were adapted,—that their legitimate use would naturally confine them to the home or to the shop or to the place of business,—were all circumstances of substantial significance. True, a Winchester rifle might be used to shoot ducks, as claimed by the defendant. But they could not shoot ducks in Ottumwa, in Boone, or in Des Moines. A .45 Colt revolver and a .38 Smith and Wesson could be used, it is true, in self-defense, but it is the exceptional few that so use them. These

carried ammunition to the limit. Nitroglycerin may be conceded a legitimate use. But the defendants had no legitimate use for it in Ottumwa or in Iowa anywhere. The sledge was purchased in Des Moines by Kelso on that very day. The seller of the sledge testified that Brown was with him at the time. Kelso testified that it was Furlong who was with him. His explanation of the purpose of the purchase was sufficiently flimsy to justify its rejection by the jury. Such explanation was that at one time he had had trouble in taking off the hub cap of his automobile. He found it necessary to tap the hub cap with a hammer in order to loosen it. Such was the purpose of the purchase. His automobile was in Indiana at the time of the purchase. This is perhaps a sufficient indication of the nature of the circumstances, which the jury had a right to consider in arriving at the intent attending the possession of these tools. See, also, Code, section 13000.

Except as already pointed out, there is no error in the record. The judgment below is accordingly affirmed.

KINDIG, C. J., and DONEGAN, CLAUSSEN, ALBERT, and STEVENS, JJ., concur.